UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
EMPRESS HADIYA BEY,

                        Plaintiff,

            - against -

HENRI ROC, *et al.*,

                        Defendants.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
19-CV-1877 (PKC) (JAM)

PAMELA K. CHEN, United States District Judge:

Plaintiff Empress Hadiya Bey ("Plaintiff" or "Bey"), proceeding *pro se*, commenced this action on March 27, 2019, against 96 state, municipal, and individual defendants. The Court previously dismissed the claims against the vast majority of defendants, (Dkts. 6, 9; 12/10/2019 Min. Entry; 2/18/2021 Dkt. Order), and now the only remaining Defendants are New York City Police Department ("NYPD") Officers Joey Brockington and Jason Rocke (collectively, the "City Defendants") and New York State Court Officers Francis Shea and Henri Roc (collectively, the "State Defendants"). The City Defendants and State Defendants have each filed separate motions for summary judgment, which are now ripe for disposition. For the reasons explained below, the State Defendants' motion for summary judgment is granted in its entirety. The City Defendants' motion for summary judgment, on the other hand, is granted as to the false arrest and excessive force claims against Defendant Rocke, but denied as to the unlawful entry claim as to Defendant Brockington. Because there are no claims remaining against Defendants Shea, Roc, and Rocke, they are dismissed from this action.

# BACKGROUND

## I.    Factual Background[1]

### A.    Family Court Proceedings

Plaintiff is the parent of four children.  (*See* City Defs.' R. 56.1 Statement, Dkt. 171 ("City 56.1") ¶ 7.)  On April 27, 2018, Kings County Family Court (the "Family Court") issued an Order authorizing "agents for the Administration for Children's Services, persons conducting a child protective investigation, accompanied by police . . . to enter [Plaintiff's apartment] to determine if children are present and to access the home and to proceed with a child protective investigation." (*Id.* ¶ 3 (quoting 4/27/18 Family Court Order, Dkt. 170-3).)  The April 27, 2018 Order authorized police to use force while entering the premises if necessary.  (*Id.* ¶ 4 (quoting same).)  On May 3, 2018, the Family Court issued two additional Orders authorizing removal of all four of Plaintiff's children (the April 27 and May 3 Orders, collectively, the "Removal Orders").  (*Id.* ¶¶ 5–8.)

### B.    May 4, 2018 Arrest

The following day, May 4, 2018, two workers from the City of New York's Administration for Children's Services ("ACS") and four or five NYPD officers entered Plaintiff's apartment to remove her children pursuant to the Removal Orders.  (*Id.* ¶ 9.)  Plaintiff was not present in the

---

[1] The facts below are taken from Defendants' Rule 56.1 statements, the parties' affidavits, and exhibits.  Unless otherwise noted, where Defendants' 56.1 statements are cited, the fact is undisputed or Plaintiff has pointed to no evidence in the record to contradict it.  Any citation to a 56.1 statement incorporates by reference the documents cited therein; where relevant, however, the Court may cite directly to an underlying document.  Here, Plaintiff has submitted an "Affidavit of Fact and Request to Go to Trial" that does not comply with the requirements of Local Rule 56.1 since it cites no evidence and does not contain corresponding references to Defendants' Rule 56.1 statements. (*See* Dkt. 173); *see* Loc. Civ. R. 56.1(b).  The Court notes, however, that "where a *pro se* plaintiff fails to submit a proper Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions."  *Wali v. One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009) (citing *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001)).

home at the time, but the children's father was.  (*Id.* ¶ 10.)  The children's father called Plaintiff and informed her that ACS had entered their home to remove the children.  (*Id.* ¶ 11.)  Plaintiff stopped what she was doing and ran toward home.  (*Id.* ¶ 13.)  She also called 911.  (*Id.* ¶ 14.)  When Plaintiff arrived home, she asked the ACS workers and police officers what they were doing in her home.  (*Id.* ¶ 16.)  The ACS workers and/or police officers showed Plaintiff one of the Removal Orders.  (*Id.*)  Plaintiff stated that she would not allow her children to be removed.  (*Id.* ¶ 17.)

Then, a second set of NYPD officers, including Defendant Rocke, arrived in response to Plaintiff's 911 call.  (*Id.* ¶ 18.)  As the ACS workers attempted to remove Plaintiff's children, Plaintiff told an ACS worker that she (Plaintiff) was "definitely going to sue [the worker]," and that the worker was "lucky [Plaintiff didn't] kill [her]."  (*Id.* ¶ 19.)  By her own admission, Plaintiff stated that she "definitely threatened" one of the ACS workers.  (Pl.'s City Dep., Dkt. 170-6 at 200:2–17.)[2]  Plaintiff then told both the ACS workers and police officers that "nobody [was] leaving" the apartment and moved toward the door to close and lock it.  (City 56.1 ¶¶ 20–24.)  Before Plaintiff was able to lock the door, Rocke restrained her and handcuffed her left hand.  (*Id.* ¶ 25.)  As he did so, Plaintiff attempted to pull away from Rocke and stated: "Nobody is leaving out of here.  Ya'll not gonna take nobody out of here.  It's gonna be over my dead body."  (*Id.* ¶ 26.)  The police officers then arrested Plaintiff and took her to the police station.  (*Id.* ¶¶ 26–29.)

After the arrest, Plaintiff's handcuffs "kept getting tighter and tighter."  (Pl. City Dep., Dkt. 170-6 at 218:8–12; *see also id.* at 219:6–15.)  Plaintiff did not tell any of the officers that her handcuffs were too tight, nor did she ask them to remove the handcuffs.  (*Id.* at 219:1–15, 220:6–

---

[2] Plaintiff was deposed twice during this case: first by the City Defendants, on September 7, 2023, (*see* Pl. City Dep., Dkt. 170-6), and then by the State Defendants, on September 11, 2023, (*see* Pl. State Dep., Dkt. 180-1).

9.)  When Plaintiff and the arresting officers arrived at the precinct, Plaintiff told the officers not to touch her, so they were unable to remove her handcuffs.  (*Id.* at 219:16–20, 220:4–5.)  The officers then placed Plaintiff in a holding cell.  (City 56.1 ¶ 31.)  Though Plaintiff later testified that she was in "excruciating" pain from the handcuffs, she continued to tell the officers not to remove them.  (*Id.* ¶¶ 32–34; Pl. City Dep., Dkt. 170-6 at 164:19–21.)  Officers then asked Plaintiff if she wanted medical attention; she said no, and continued to tell them not to touch her handcuffs.  (City 56.1 ¶ 35.)  Some hours later, a police sergeant successfully removed Plaintiff's handcuffs without incident.  (*Id.* ¶ 36.)  Plaintiff was charged with obstruction of governmental administration, arraigned, and released.  (*Id.* ¶¶ 2, 38.)

On May 5, 2018, after Plaintiff was released, she sought medical treatment for pain in her wrists at Methodist Hospital in Brooklyn.  (*Id.* ¶¶ 52–53.)  Hospital staff diagnosed her with generalized body aches and musculoskeletal pain, (Methodist Hosp. Recs., Dkt. 180-7 at ECF[3] 4), and gave her Tylenol, (City 56.1 ¶ 53).

### C.    May 6, 2018 Car Crash

The following day, May 6, 2018, a car struck Plaintiff while she was crossing the street.  (*Id.* ¶ 54; *see also* Brooklyn Hosp. Recs., Dkt. 170-8 at ECF 8.)  When Plaintiff saw the car approaching, she attempted to signal it to stop by sticking out her left hand, which resulted in injury to her left wrist.  (City 56.1 ¶ 56.)  An ambulance transported Plaintiff to Brooklyn Hospital, where she sought treatment.  (*Id.* ¶ 55.)  Hospital staff found that Plaintiff's right wrist was uninjured, and that her left wrist had "a full range of movement, no contusions, swelling, or lacerations of the left hand," but that Plaintiff "grimace[d]" "slight[ly]" when flexing her left wrist.  (*Id.* ¶¶ 57–58.)

---

[3] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

X-rays of Plaintiff's left wrist, however, showed "[n]o discernable abnormality," including "[n]o fracture or dislocation." (Brooklyn Hosp. Recs., Dkt. 170-8 at ECF 29.) Plaintiff was provided Motrin and discharged. (City 56.1 ¶ 60.)

### D.    May 22, 2018 Arrest

About a week after ACS had removed Plaintiff's children, building management at Plaintiff's apartment building installed cameras in the hallways, including outside the door to Plaintiff's apartment. (Pl. City Dep., Dkt. 170-6 at 240:24–241:2.) Unhappy with the cameras, Plaintiff attempted to cut them down. (*Id.* at 241:3–15.) On May 22, 2018, the superintendent of the building called 911 after he found out, through camera footage, that Plaintiff was responsible for destroying at least one of the cameras. (City 56.1 ¶ 40.) The police came, and the building superintendent identified Plaintiff as the person who had destroyed the cameras. (*Id.* ¶¶ 41–42.) Several NYPD officers spoke with, or attempted to speak with, Plaintiff, who eventually admitted that she had destroyed, or attempted to destroy, the cameras in the building hallways. (*Id.* ¶¶ 43–46.) Defendant Brockington, who was among the officers on the scene, informed Plaintiff that she would be arrested. (*Id.* ¶ 47.) Plaintiff stated that she wanted to put her things down in her apartment, and then would come outside to be arrested. (*Id.* ¶ 48.) Brockington then placed his foot in the doorway to Plaintiff's apartment, presumably to keep the door open while Plaintiff placed her belongings inside and to ensure that she came back out and did not lock herself inside the apartment. (Pl. City Dep., Dkt. 170-6 at 249:23–251:22, 260:15–19.)[4] Plaintiff testified that

---

[4] Defendant Brockington was never deposed, and the City Defendants did not submit an affidavit from him in connection with their summary judgment motion. Though the City Defendants deny that Brockington stuck his foot in Plaintiff's doorway, they do not cite any evidence for that assertion. (*See* City Mem. Supp. Summ. J., Dkt. 172 at 16.) Thus, Plaintiff's testimony that Brockington placed his foot in her doorway is undisputed for the purposes of summary judgment. *See* Fed. R. Civ. P. 56(e) (stating that "[i]f a party fails to properly support an assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion").

she told Brockington to remove his foot from the door, but he refused.  (*Id.* at 254:3–20.)  Shortly thereafter, Plaintiff placed her belongings inside the apartment and stepped back into the hallway. (City 56.1 ¶ 51.)  She was handcuffed and placed under arrest.  (*Id.*)

    **E.**    **October 9, 2018 Arrest**

On October 9, 2018, Plaintiff visited the Kings County Civil Court Clerk's Office ("County Clerk's Office") with a friend to file a claim relating to real property that she believed her grandfather owned.  (State Defs.' R. 56.1 Statement, Dkt. 183 ("State 56.1") ¶ 8.)  When she tried to file the documents, a clerk told her that the documents needed to be notarized.  (*Id.* ¶ 11.) Plaintiff then began video recording with her cell phone.  (*Id.* ¶ 12.)  She asked another clerk for a notary; that clerk responded that there were no notaries at the courthouse.  (*Id.* ¶¶ 12–13.)  Plaintiff then told one of the clerks that she was recording the interaction.  (*Id.* ¶ 15.)  That clerk stepped away from the desk, and when the clerk returned a few minutes later, Plaintiff reiterated that she was recording.  (*Id.* ¶¶ 15–16.)  Defendants Shea and Roc, both court officers responsible for maintaining order and security in the Kings County courthouse, then approached Plaintiff.  (*Id.* ¶¶ 1–2, 18.)  One of the officers, either Shea or Roc, asked Plaintiff to stop recording.  (*Id.* ¶ 19.) She responded by stating that she was "not in the Courthouse," (*id.* ¶ 20), and that there was "no sign saying [she could not] record" there, (Pl. State Dep., Dkt. 180-1 at 88:4–6).  Defendant Shea asked Plaintiff to see the video she had taken.  (*Id.* at 88:10–12; Shea Decl., Dkt. 181 ¶ 18). Plaintiff refused, citing her rights under the Fourth Amendment, and began yelling "this is not a real court."  (Pl. State Dep., Dkt. 180-1 at 88:10–12; Shea Decl., Dkt. 181 ¶ 19.)  One of the State Defendants told Plaintiff that if she did not hand her phone over, they would arrest her.  (Pl. State Dep., Dkt. 180-1 at 116:14–24.)  Plaintiff then placed her phone, and the phone of the friend who had accompanied her, in her backpack, locked the backpack, and attempted to leave.  (*Id.* at 88:15– 18, 107:11–15; Shea Decl., Dkt. 181 ¶ 21.)  The parties dispute what happened next.  According

6

to Plaintiff, the State Defendants and other court officers who had arrived on the scene "wrest[led her] to the ground" so that they could handcuff her. (Pl. State Dep., Dkt. 180-1 at 108:4–11.)[5] According to the State Defendants, as Plaintiff was attempting to evade arrest, Defendants Roc and Shea simultaneously grabbed Plaintiff's flailing arms, which caused all three of them to fall to the ground. (Shea Decl., Dkt. 181 ¶ 22; Roc Decl., Dkt 182 ¶ 22.) However, the parties agree that although Plaintiff was "flailing her arms" in an attempt to resist arrest, one of the court officers ultimately was able to handcuff her while she was on the ground. (Pl. State Dep., Dkt. 180-1 at 117:6–25; Shea Decl., Dkt. 181 ¶¶ 22, 24; Roc Decl., Dkt 182 ¶¶ 22, 24.)

At approximately 1:15 p.m., Plaintiff was arrested. (State 56.1 ¶ 35.) She was charged with resisting arrest, obstructing governmental administration, and disorderly conduct. (*Id.* ¶ 37.)

---

[5] Plaintiff repeatedly testified at her deposition that, during this arrest, several court officers "wrest[led her] to the ground" so that they could handcuff her. (Pl. State Dep., Dkt. 180-1 at 108:4–11; *id.* 110:25–111:2 (same); *id.* at 115:10–13 (same); *id.* at 133:23–24 (same).) However, at one point, she testified instead that one of the State Defendants effectuated her arrest by grabbing her arm, handcuffing her before she was on the ground, and "slamm[ing her] to the ground like a dog." (*Id.* at 88:20–22.) Her testimony that a court officer handcuffed her and then "slammed [her] to the ground" is contradicted both by her own repeated testimony that she was wrestled to the ground and then handcuffed, (*see id.* at 108:4–11, 110:25–111:2, 115:10–13), and by the medical records from later that day, which did not reveal any injury of the kind one would expect of an individual who had been "slammed" to the ground, (Brooklyn Hosp. Recs., Dkt. 180-5 at ECF 10–23). Thus, the Court does not consider Plaintiff's allegation that she was "slammed" to the ground, because no reasonable jury would credit this testimony, given that it is contradicted by the bulk of Plaintiff's own testimony, as well as the contemporaneous medical records. Indeed, Plaintiff testified that as a result of the October 9, 2018 arrest, she "had bruises all over [her] arms and back," but her medical records do not reflect this. (*Compare* Pl. State Dep., Dkt. 180-1 at 145:13–17, *with* Brooklyn Hosp. Recs., Dkt. 180-5 at ECF 10–23); *see also Rolkiewicz v. City of New York*, 442 F. Supp. 3d 627, 641 (S.D.N.Y. 2020) (explaining that a court need not credit a plaintiff's testimony where "'undisputed medical records directly and irrefutably contradict a plaintiff's descriptions of his injuries, [] [such that] no reasonable jury could credit plaintiff's account of the happening'" (emphasis omitted) (quoting *Henry v. Officer Pierce*, No. 11-CV-0845 (ALC), 2017 WL 3610507, at *2 (S.D.N.Y. Aug. 21, 2017))); *Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) (affirming grant of summary judgment where the only evidence supporting plaintiff's allegations was his own testimony, and, after considering that testimony, the lower court found that 'no reasonable person could believe [plaintiff's] testimony'" (citation omitted)).

After Plaintiff was arrested, she complained that her back hurt, and so Emergency Medical Services ("EMS") was called. (*Id.* ¶ 38.) Plaintiff told EMS not to touch her, and instead to take her to the hospital. (Pl. State Dep., Dkt. 180-1 at 129:3–12.) EMS took Plaintiff to Brooklyn Hospital, where she reported back pain, among other things. (State 56.1 ¶¶ 36, 41; Brooklyn Hosp. Recs., Dkt. 180-5 at ECF 10.) Hospital staff performed various medical tests, which did not show any fracture, dislocation, or other abnormality. (State 56.1 ¶ 42.) In addition, hospital staff offered Plaintiff pain medication, which she refused. (*Id.* ¶ 44.) Plaintiff testified that when she left the hospital, she had bruises on her arms and back, shoulder pain, and swelling in her arms. (*Id.* ¶ 45.) None of these injuries are reflected in the medical records. (*Id.*)

About six months later, in April 2019, Plaintiff sought additional medical treatment. (*Id.* ¶ 47.) At that time, Plaintiff complained of right arm pain and numbness in her right thumb after being arrested and handcuffed in "November" of the previous year. (*Id.*) X-rays of Plaintiff's right hand did not show any abnormalities, but Plaintiff was diagnosed with a sprain of her right wrist. (*Id.* ¶¶ 48, 50.) She was prescribed ibuprofen and use of a wrist brace. (*Id.* ¶ 49.)

### F. Plaintiff's Injuries

Plaintiff testified that she sustained "irreparable damage to [her] arms, back, and wrist" as a result of her May 4, 2018 arrest. (Pl. City Dep., Dkt. 170-6 at 260:5–7.) Her back "hurts all the time" and she is "always in pain." (*Id.* at 262:20–21.) Because of this injury, she can't wear a backpack or "carry too much weight." (*Id.* at 263:1–3.) Her right hand also sometimes goes numb. (*Id.* at 263:4–12.) Despite this, she has not sought any medical treatment apart from the treatment described above. (City 56.1 ¶ 70; State 56.1 ¶ 62.)

Plaintiff also testified that she suffered emotional injuries, including the onset of anxiety and post-traumatic stress disorder, because of Defendants' conduct. (Pl.'s City Dep., Dkt. 170-6 at 259:1–260:7, 265:16–266:5.) In addition, she testified that she has suffered emotional distress

since ACS removed one of her children in 2020.  (*Id.*)  Apart from an intake appointment with a mental health counselor, Plaintiff has not sought any mental health treatment for these conditions. (State 56.1 ¶¶ 64–66.)[6]

## II.   Procedural History

On March 27, 2019, Plaintiff sued 96 state, municipal, and individual defendants seeking their criminal prosecution.  (*See* Dkt. 1.)  On April 22, 2019, the Court granted Plaintiff's application to proceed *in forma pauperis*, dismissed her criminal prosecution claims, and granted Plaintiff 30 days to file an amended complaint setting forth any plausible claims pursuant to 42 U.S.C. § 1983 ("Section 1983") only.  (Dkt. 6.)  On May 17, 2019, Plaintiff filed an amended complaint asserting Section 1983 claims, naming over 150 defendants, and seeking a temporary restraining order.  (Dkt. 7.)  That same day, the Court denied Plaintiff's motion for a temporary restraining order.  (Dkt. 8.)  On July 15, 2019, the Court *sua sponte* dismissed Plaintiff's claims against all but ten defendants.  (Dkt. 9.)  At that time, the Court permitted the following claims to proceed: (1) an unlawful entry claim against various state actors—Antoine, Caban, Quintero, Toddman, Gellineau, and Epstein[7]—based on the events of May 2, 2018;[8] (2) excessive force and false arrest claims against Defendant Rocke based on the events of May 4, 2018; (3) a false arrest claim against NYPD Officer Michael Mancilla based on the events of May 22, 2018; and (4)

---

[6] Plaintiff also testified that the instant lawsuit has caused her to lose relationships with friends, family members, and business contacts.  (Pl. State Dep., Dkt. 180-1 at 184:7–25.)

[7] The Court refers to these former defendants only by last name because most of their first names are not in the record.

[8] The Court does not describe Plaintiff's allegations as to the events of May 2, 2018, in detail because they are no longer a part of this case.  In short, Plaintiff previously alleged that "[o]n May 2, 2018, without any warrant, police officers entered Plaintiff's apartment through a kitchen window, located off the fire escape, after Plaintiff refused to allow the officers and ACS workers to enter through her front door."  (*See* Dkt. 9 at 4.)

excessive force and false arrest claims against Defendants Shea and Roc based on the events of October 9, 2018.  (*See id.*)  Thereafter, Antoine, Caban, Quintero, Toddman, Gellineau, and Epstein, produced a warrant that ultimately resulted in the dismissal of the warrantless entry claims against them, (*see* Dkts. 19, 19-1; 11/20/2019 & 12/10/2019 Dkt. Entries; 12/10/2019 Min. Entry),[9] and the Court permitted Plaintiff to amend her Amended Complaint orally to add an unlawful entry claim against Defendant Brockington based on the events of May 22, 2024, (*see* 11/17/2020 Min. Entry; Dkt. 65).  Mancilla then moved to dismiss the false arrest claim against him.  (Dkt. 39.)  The Court granted his motion.  (2/18/2021 Dkt. Order.)  Thereafter, Rocke moved to dismiss the claims against him, (Dkts. 71, 72), but the Court denied his motion, (Dkt. 81).  The remaining Defendants—that is, Rocke, Brockington, Shea, and Roc—answered Plaintiff's Amended Complaint.  (Dkts. 46, 47, 83, 126.)

The remaining parties proceeded to discovery.  (*See, e.g.*, 12/7/2021 & 3/30/2022 Min. Entries; 7/6/2022 Dkt. Order; Dkts. 89–93, 104, 107, 122–23, 135–39.)  On March 3, 2023, Plaintiff filed a letter motion seeking summary judgment, which the Court denied as premature given that discovery was ongoing.  (Dkt. 129; 3/9/2023 Dkt. Order.)  On February 23, 2024, after significant motion practice, the Honorable Joseph A. Marutollo, Magistrate Judge, certified completion of discovery in this case.  (2/23/2024 Dkt. Order.)  The City Defendants and the State Defendants then filed separate requests for a pre-motion conference in advance of filing their respective motions for summary judgment.  (Dkts. 163–64.)  Plaintiff opposed the requests and asked that the Court set a trial date.  (Dkts. 166, 167.)  The Court denied Defendants' pre-motion

---

[9] Plaintiff appealed the Court's dismissal of the warrantless entry claims against Antoine, Caban, Quintero, Toddman, Gellineau, and Epstein, but her appeal was ultimately dismissed by the Second Circuit.  (Dkts. 35, 48.)  Indeed, Plaintiff has filed several unsuccessful appeals during this litigation.  (*See* Dkts. 74, 79, 108, 120, 124, 127.)

conference requests as unnecessary and set a briefing schedule for the motions for summary judgment.  (3/28/2024 Dkt. Order.)  The parties then briefed the motions, which are now ripe. (Dkts. 168–188.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (explaining that the summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

The initial burden of "establishing the absence of any genuine issue of material fact" rests with the moving party.  *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (per curiam).  Once this burden is met, the burden shifts to the nonmoving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial.  *Spinelli v. City of New York*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp v. Catrett*, 477 U.S. 317, 322–23 (1986).  A mere "scintilla of evidence" in support of the nonmoving party is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]."  *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (alteration in original) (quoting *Anderson*, 477 U.S. at 252). That is, "[t]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

In determining whether a genuine issue of fact exists, the Court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). The Court also construes any disputed facts in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–59 (1970). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48 (emphasis omitted).

The Second Circuit "liberally construe[s] pleadings and briefs submitted by *pro se* litigants, reading such submissions to raise the strongest arguments they suggest." *Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007) (citations omitted). Nevertheless, "[p]roceeding *pro se* does not otherwise relieve a litigant of the usual requirements of summary judgment, and a *pro se* party's bald assertions unsupported by evidence, are insufficient to overcome a motion for summary judgment." *Rodriguez v. Hahn*, 209 F. Supp. 2d 344, 348 (S.D.N.Y. 2002) (citation omitted).

## DISCUSSION

## I. Claims Presented

On May 3, 2024, during the summary judgment briefing process, Plaintiff filed an "Affidavit of Fact and Request to Go to Trial," which the Court construed as her opposition to Defendants' summary judgment motion (hereinafter "Plaintiff's Opposition"). (Dkt. 173.) In that document, Plaintiff stated that she did not bring any Section 1983 claims, and that, instead, her Complaint was brought "pursuant to 42 U.S.C. § 1986." (*Id.* at ECF 2.) Some two months later, Plaintiff filed a letter on the docket again stating that she did not bring a Section 1983 claim. (Pl.'s 7/4/24 Ltr., Dkt. 177 at ECF 1.) In that filing, she stated that "[t]his case has always been a Tort/Personal Injury Claim." (*Id.* at ECF 1–2.)

As an initial matter, Plaintiff is incorrect that "[t]his case has always been a Tort/Personal Injury Claim." (*Id.* at ECF 1–2.) Plaintiff's initial Complaint was styled as a "Criminal Complaint," (*see* Compl., Dkt. 1 at ECF 5), but "include[d] almost no specific factual allegations," (4/22/19 Mem. & Order, Dkt. 6 at 2; *see also generally* Compl., Dkt. 1). The Court found that Plaintiff's original Complaint contained no facts that could give rise to any legal claim and therefore dismissed it. (4/22/19 Mem. & Order, Dkt. 6 at 8.) But, given Plaintiff's *pro se* status, this Court "liberally construe[d]" Plaintiff's original Complaint "as asserting false arrest and malicious prosecution claims pursuant to § 1983," and permitted her leave to amend her Complaint "as to her § 1983 claim only." (*Id.* at 6, 8.) To be sure, the Court has again reviewed the record in this case, including Plaintiff's original Complaint, (Dkt. 1), the operative Amended Complaint, (Dkt. 7), and the Court's November 17, 2020 Minute Entry, in which the Court noted its acceptance of Plaintiff's oral amendment of the operative Amended Complaint, (*see* 11/17/2020 Min. Entry). None of these documents, liberally construed, suggest that Plaintiff intended to bring tort claims. With respect to Plaintiff's purported 42 U.S.C. § 1986 ("Section 1986") claim, to state a claim under Section 1986, a plaintiff must first state a valid claim under 42 U.S.C. § 1985 for conspiracy to violate their civil rights. *Thomas v. Genova*, No. 23-7452, 2025 WL 583182, at *4 (2d Cir. Feb. 24, 2025) (summary order). But neither of Plaintiff's complaints, liberally construed, raised a plausible inference of any conspiracy to violate Plaintiff's civil rights. (*See* Dkts. 1, 7.) Thus, Plaintiff's allegations that this case contained personal injury and/or Section 1986 claims is inaccurate. To the extent that Plaintiff seeks leave to amend her complaint to include personal injury and/or Section 1986 claims—after the case has been pending for nearly six years and absent any showing of good cause—this Court declines to grant her leave to do so. *See AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 726–27 (2d Cir. 2010) (affirming

denial of motion to amend filed three years after the case began and after motions for summary judgment had been filed). Consequently, the Court considers only Plaintiff's Section 1983 claims.[10]

## II. Section 1983 Claims

### A. Legal Standards

#### 1. False Arrest

A "[Section] 1983 claim for false arrest derives from [a plaintiff's] Fourth Amendment right to remain free from unreasonable seizures." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006). To prevail on a false arrest claim, a plaintiff must prove that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York*, 331 F. 3d 63, 75 (2d Cir. 2003) (citation omitted). "[T]he existence of probable cause is an absolute defense to a false arrest claim." *Jaegly*, 439 F.3d at 152. "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (citation omitted). Whether probable cause exists is analyzed from an objective perspective and depends on the facts known to the arresting officer and/or other law enforcement officials involved with the investigation at the time of the arrest; the arresting officer's state of mind is irrelevant. *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007). Moreover,

---

[10] In their Reply, the City Defendants argue that Plaintiff has "abandoned all of her Section 1983 claims" against the City Defendants by stating that she intended only to bring a claim pursuant to Section 1986. (City Defs.' Reply Supp. Summ. J., Dkt. 176 at 2–4.) Given Plaintiff's *pro se* status, the Court declines to construe Plaintiff's assertion that she sought to bring only Section 1986 claims as abandonment of her Section 1983 claims.

"[t]he fact that [a] plaintiff was ultimately acquitted [of the alleged offense] does not mean that the officers did not have probable cause to arrest him." *Dudley v. Torres*, No. 05-CV-1729 (RJD) (LB), 2008 WL 2149603, at *5 n.5 (E.D.N.Y. May 21, 2008) (quoting *Brogdon v. City of New York*, 200 F. Supp. 2d 411, 421 (S.D.N.Y. 2002)).

### 2.    Excessive Force

#### a.    Generally

Claims that law enforcement officers used excessive force during an arrest are analyzed under the Fourth Amendment's "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388, 395–96 (1989); *accord Szabo v. Parascandolo*, No. 16-CV-3683 (PKC) (LB), 2019 WL 481925, at *5 (E.D.N.Y. Feb. 7, 2019) (citing *Kerman v. City of New York*, 261 F.3d 229, 238–39 (2d Cir. 2001)). "Because 'the Fourth Amendment test of reasonableness is one of objective reasonableness,' the inquiry is necessarily case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (quoting *Bryant v. City of New York*, 404 F.3d 128, 136 (2d Cir. 2005)) (cleaned up); *see also Graham*, 490 U.S. at 396 ("Because '[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,' . . . its proper application requires careful attention to the facts and circumstances of each particular case." (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979))). The "key question . . . is 'whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Chamberlain v. City of White Plains*, 960 F.3d 100, 113 (2d Cir. 2020) (quoting *Graham*, 490 U.S. at 397); *see Brown v. City of New York*, 798 F.3d 94, 100–01 (2d Cir. 2015) ("[T]he officer's state of mind, whether evil or benign, is not relevant.").

In determining whether an officer's actions were reasonable, courts consider the totality of the circumstances facing the officer, including, *inter alia*, "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Tracy*, 623 F.3d at 96 (citing *Graham*, 490 U.S. at 396). The officer's actions must be evaluated "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006) (quoting *Graham*, 490 U.S. at 396). In light of the fact-specific nature of the excessive force inquiry, summary judgment against a plaintiff on such a claim is only appropriate where "no reasonable factfinder could conclude that the [officer's] conduct was objectively unreasonable." *Lennox v. Miller*, 968 F.3d 150, 155 (2d Cir. 2020) (citation omitted).

### b.    Based on Tight Handcuffing

In the Second Circuit, there is a body of caselaw that specifically governs excessive force claims based on tight handcuffing. *See, e.g.*, *Cugini v. City of New York*, 941 F.3d 604, 613 (2d Cir. 2019); *Pal v. Canepari*, No. 23-730, 2024 WL 4341360, at *1–2 (2d Cir. Sept. 30, 2024); *Ketcham v. City of Mount Vernon*, 992 F.3d 144, 149–50 (2d Cir. 2021). According to that caselaw, in evaluating excessive force claims based on handcuffing, courts ask "whether an officer reasonably should have known during handcuffing that his use of force was excessive." *Cugini*, 941 F.3d at 613. In addition, courts in the Second Circuit typically consider the following evidentiary factors as a part of that inquiry: "(1) [whether] the [arrestee's] handcuffs were unreasonably tight; (2) [whether] the defendants ignored the arrestee's pleas that the handcuffs were too tight; and (3) the degree of injury to the [arrestee's] wrists." *Id.* at 612–13 (quoting *Esmont v. City of New York*, 371 F. Supp. 2d 202, 215 (E.D.N.Y. 2005)). At bottom, a "plaintiff

16

satisfies this requirement if either the unreasonableness of the force used was apparent under the circumstances, or the plaintiff signaled her distress, verbally or otherwise, such that a reasonable officer would have been aware of her pain." *Id.*

### 3.    Unlawful Entry

"The Fourth Amendment ordinarily requires that police officers get a warrant before entering a home without permission" unless "'the exigencies of the situation' create a compelling law enforcement need." *Lange v. California*, 594 U.S. 295, 298 (2021) (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)). Absent an exigent situation, officers may lawfully enter a home if an occupant provides consent. *Florida v. Jimeno*, 500 U.S. 248, 250–51 (1991). An occupant's permission to enter the premises need not be express. *United States v. Grant*, 375 F. App'x 79, 80 (2d Cir. 2010) (summary order) ("[A] search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to [enter].'" (quoting *United States v. Buettner–Janusch*, 646 F.2d 759, 764 (2d Cir. 1981))). In determining whether an individual consented to an officer's entrance, courts again apply a standard of "objective reasonableness." *See Jimeno*, 500 U.S. at 251 ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?").

### 4.    Qualified Immunity

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam) (quoting *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (per curiam)); *see also Rogoz v. City of Hartford*, 796 F.3d 236, 247 (2d Cir. 2015) ("The doctrine of '[q]ualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time

of the challenged conduct.'" (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012))).  When an officer invokes qualified immunity in support of a motion for summary judgment, the court considers two questions: "(1) whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Tracy*, 623 F.3d at 96.  There need not be caselaw "directly on point for a right to be clearly established," but "existing precedent must have placed the statutory or constitutional question beyond debate," or else qualified immunity will not attach. *Kisela*, 584 U.S. at 104 (quoting *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (per curiam)).

    **B.**    **Analysis**

        1.    <u>False Arrest and Excessive Force Claims Against Defendant Rocke Based on the Events of May 4, 2018</u>

Broadly construing Plaintiff's claims, she brings false arrest and excessive force claims against Defendant Rocke based on his participation in her arrest on May 4, 2018.  The Court addresses each claim in turn, and for the reasons explained below, grants summary judgment to Defendant Rocke.

        a.    <u>False Arrest</u>

Plaintiff's false arrest claim against Defendant Rocke fails because the record shows as a matter of law that Rocke had probable cause to arrest Plaintiff.  "[T]he existence of probable cause is an absolute defense to a false arrest claim." *Jaegly*, 439 F.3d at 152.  In this case, Rocke arrested Plaintiff for obstruction of governmental administration after Plaintiff, by her own admission, threatened an ACS worker who was attempting to remove her children, (Pl.'s City Dep., Dkt. 170-6 at 200:2–17), and then attempted to lock several ACS workers and police officers, including Rocke, inside her apartment, (City 56.1 ¶¶ 20–24).

An individual is guilty of obstructing governmental administration under New York law if they "(1) prevent[] or attempt to prevent (2) a public servant from performing (3) an official function (4) by means of intimidation, force or interference." *Cameron v. City of New York*, 598 F.3d 50, 68 (2d Cir. 2010) (quoting *Lennon v. Miller,* 66 F.3d 416, 424 (2d Cir. 1995)). Here, Rocke witnessed Plaintiff threaten an ACS worker attempting to carry out the removal of Plaintiff's children pursuant to the Removal Orders, and attempt to lock all of the ACS workers and police officers present inside Plaintiff's apartment. (City 56.1 ¶¶ 5–8, 20–24.) In so doing, Plaintiff attempted to prevent public servants—the ACS workers and police officers—from carrying out an official function—removal of Plaintiff's children pursuant to judicial orders—with intimidation and physical interference. On the record before the Court, there can be no doubt that Defendant Rocke had probable cause to arrest Plaintiff for obstruction of governmental administration. This precludes Plaintiff's false arrest claim against him. Summary judgment is therefore granted to Defendant Rocke on this claim.

### b.    Excessive Force

Plaintiff's excessive force claim against Defendant Rocke also fails, and summary judgment is granted to him on that claim as well. Plaintiff's excessive force claim against Rocke is based on his use of handcuffs during Plaintiff's May 4, 2018 arrest. But no jury could find that a reasonable officer in Rocke's position would have known that Plaintiff's handcuffs were too tight. *See Usavage v. Port Auth. of N.Y. & N.J.*, 932 F. Supp. 2d 575, 592 (S.D.N.Y. 2013) ("[The excessive force] inquiry must reflect the totality of the circumstances, including any facts that bear on whether use of an unusual degree of force may have been justified."). As an initial matter, the Court finds that Rocke's use of handcuffs—setting aside Plaintiff's allegations that the handcuffs were excessively tight—was reasonable in this instance. *See Soares v. Connecticut*, 8 F.3d 917,

921 (2d Cir. 1993) (holding that while the use of handcuffs is not *per se* reasonable in every arrest, "handcuffing will be the reasonable course in many, if not most arrest situations"). According to Plaintiff's own testimony, at the time of her arrest, she had threatened an ACS worker and was attempting to lock several ACS workers and police officers inside her home. (Pl. City Dep., Dkt. 170-6 at 200:2–17; City 56.1 ¶¶ 19–24.) Moreover, the arrest report detailing Plaintiff's May 4, 2018 arrest states that Plaintiff "was refusing to comply with simple police commands," "making physical threats to ACS workers," and "attempting to block [her] children from ACS and police." (Arrest Report, Dkt. 170-2 at 1.) Thus, the Court finds that it was reasonable for Defendant Rocke to handcuff Plaintiff in the first place.

Next, the Court considers whether Plaintiff has raised a genuine question of material fact as to whether Defendant Rocke used excessive force in handcuffing Plaintiff. To start, according to Plaintiff's own testimony, she did not tell Rocke or any other police officer present during or after her arrest, that that her handcuffs were too tight, nor did she ask any of them to remove the handcuffs at any time. (Pl. City Dep., Dkt. 170-6 at 219:1–15, 220:6–9.) Quite the opposite: at the police precinct, Plaintiff told the officers not to touch her, so they could not remove her handcuffs. (*Id.* at 164:19–165:1, 219:16–20, 220:4–5.) Thus, Plaintiff has not shown that Defendant Rocke ignored her "pleas that [her] handcuffs were too tight," *Pierre v. Madena*, No. 19-CV-0247 (LDH) (DB), 2024 WL 1332669, at *3 (E.D.N.Y. 2024), because by her own admission, she never indicated that the handcuffs were too tight. Relatedly, Plaintiff herself testified that she did not realize the handcuffs were too tight until she was placed in the holding cell at the police station, although even then, she did not say that to anyone nor ask to have the handcuffs loosened or removed. (Pl. City. Dep., Dkt. 170-6 at 164:19–21.) This begs the question of how a reasonable officer in Defendant Rocke's position could have known that Plaintiff's

handcuffs were too tight when Plaintiff herself did not even notice they were too tight until after she reached the police station.

In addition, though Plaintiff testified that she has suffered "irreparable damage to [her] arms, back, and wrist" as a result of the May 4, 2018 arrest, (Pl.'s City Dep., Dkt. 170-6 at 260:5–7), her medical records tell a different story.  Indeed, the medical records from Plaintiff's visit to Brooklyn Methodist Hospital after she was arraigned that day show both of her arms without any weakness or swelling.  (Methodist Hosp. Recs., Dkt. 180-7 at ECF 9.)  The only medical record in evidence that demonstrates any injury to Plaintiff's wrists, hands, or arms, beyond generalized pain is the record from Plaintiff's visit to Brooklyn Hospital after the car crash on May 6, 2018.  (City 56.1 ¶¶ 57–58; *see also* Brooklyn Hosp. Recs., Dkt. 170-8 at ECF 29.)  Aside from strongly suggesting that any ongoing injury to Plaintiff's wrist or hand after May 6, 2018 was due to the car crash, these records fail to show that Plaintiff suffers from any lasting or permanent injury.  Thus, Plaintiff's claims of "irreparable damage" to her wrists, hands, and/or arms are little more than "bald assertions unsupported by evidence."  *Rodriguez*, 209 F. Supp. 2d at 348.

Considering the totality of the evidence, the Court finds that Plaintiff has failed to raise a genuine question of material fact as to whether Defendant Rocke "reasonably should have known during handcuffing that his use of force [on May 4, 2018] was excessive."  *Cugini*, 941 F.3d at 613.  Rather, the undisputed evidence shows that Rocke reasonably would not have known.  As a result, Plaintiff's excessive force claim against Rocke cannot survive summary judgment.

2.    Unlawful Entry Claim Against Defendant Brockington
Based on the Events of May 22, 2018

Plaintiff brings an unlawful entry claim against Defendant Brockington based on his foot preventing Plaintiff's apartment door from closing after he advised Plaintiff that she was under arrest on May 22, 2018.[11]

The City Defendants argue that Plaintiff's unlawful entry claim fails because "no warrant was required for [Defendant Brockington] to place his foot at the door to arrest [P]laintiff, because she consented to entry while standing at the door." (City Mem. Supp. Summ. J., Dkt. 172 at 16.) But Plaintiff testified at one of her depositions that, after Brockington placed his foot in her door, she asked him to remove his foot from her doorway multiple times, and he would not do so. (Pl. City Dep., Dkt 170-6 at 254:3–20.) Plaintiff further testified that the only reason she agreed to be arrested was because he prevented her from closing her door with his foot, and she didn't want to risk another criminal charge by slamming the door on Brockington's foot. (*Id.* at 252:19–253:22.)

As other courts have noted, there is "'extensive' Supreme Court and Second Circuit precedent emphasizing that *any* physical intrusion into the home, however slight, is a search that triggers Fourth Amendment scrutiny." *Escoffier v. City of New York*, No. 13-CV-3918 (JPO), 2019 WL 4747666, at *5 (S.D.N.Y. Sept. 30, 2019) (emphasis in original) (quoting *Dalcour v.*

---

[11] It is unclear if Plaintiff seeks to bring a claim against Defendant Brockington for arresting her without a warrant on May 22, 2018. To the extent that she does, that claim fails because warrantless arrests in public places, including common areas of apartment buildings, are legal. (*See* City 56.1 ¶¶ 47–51 (explaining that on May 22, 2018, officers arrested Plaintiff in the hallway of her apartment building); *see also Williams v. City of New York*, No. 10-CV-2676 (JG) (LB), 2012 WL 511533, at *8 (E.D.N.Y. Feb. 15, 2012) (explaining that police can make warrantless arrests in public places, including the doorway of the arrestee's home); *Ampratwum v. City of New York*, No. 11-CV-6111 (DC), 2013 WL 1935321, at *11 (holding that there is no expectation of privacy in the hallway of an apartment building). However, as discussed above, a police officer cannot enter an arrestee's premises to effectuate an arrest without a warrant or consent (absent exigent circumstances), neither of which the undisputed evidence shows Brockington had on May 22, 2018.

*City of Lakewood*, 492 F. App'x 924, 934 (10th Cir. 2012) (summary order)).  Indeed, that case

law holds that "any physical invasion of the structure of the home, 'by even a fraction of an inch,'

[i]s too much." *Kyllo v. United States*, 533 U.S. 27, 37 (2001) (quoting *Silverman v. United States*,

365 U.S. 505, 512 (1961)).  Applying this precedent, a court in the Southern District of New York

found in a similar case that a police officer violated a plaintiff's clearly established Fourth

Amendment rights by "placing a foot in the doorway of [the plaintiff's] home" without the

plaintiff's consent.  *Escoffier*, 2019 WL 4747666, at *7.  Further, that court found that the law

preventing police officers from entering individual's homes—even by only "placing a foot in the

doorway"—was clearly established.  *Id.* at *6.  As a result, it held that the police officer was not

entitled to qualified immunity.  *Id.*  So too here.  Consequently, this Court denies the City

Defendants' motion for summary judgment as to Defendant Brockington's alleged unlawful entry

of Plaintiff's apartment with his foot.[12]

        3.       <u>False Arrest and Excessive Force Claims Against</u>
                 <u>Defendants Shea and Roc Based on the Events of October 9, 2018</u>

           a.    <u>False Arrest</u>

     Plaintiff's false arrest claim against the State Defendants fails because there was probable

cause to arrest Plaintiff on October 9, 2018.  *See Jaegly*, 439 F.3d at 152 ("[T]he existence of

---

[12] That said, even if Plaintiff were to prevail on this claim at trial, her damages would be limited to nominal damages and/or garden variety emotional distress damages because her only evidence of any injury that plausibly resulted from the alleged unlawful entry is her own testimony about her mental health.  *See Sooroojballie v. Port Auth. of N.Y. & N.J.*, 816 F. App'x 536, 546 (2d Cir. 2020) (summary order) (explaining that in "garden-variety claims, the evidence of emotional harm is limited to the plaintiff's testimony, which describes his or her injuries in vague or conclusory terms" (citation omitted)); *Graham v. City of New York*, 128 F. Supp. 3d 681, 714 (E.D.N.Y. 2015) ("Awards for 'garden-variety' emotional distress, where the evidence of the harms comes from the plaintiff's testimony alone, vary widely in amount but are typically lower than those in other cases."); (*see also* Pl. City Dep., Dkt. 170-6 at 259:1–260:7 (Plaintiff testifying to the emotional distress she experienced as a result of the alleged unlawful entry)).

probable cause is an absolute defense to a false arrest claim."). After the State Defendants arrested Plaintiff, she was charged with resisting arrest, obstructing governmental administration, and disorderly conduct. (State 56.1 ¶ 37.) At a minimum, the State Defendants had probable cause to arrest Plaintiff for obstructing governmental administration.[13] An individual is guilty of obstructing governmental administration under New York law if they "(1) prevent[] or attempt to prevent (2) a public servant from performing (3) an official function (4) by means of intimidation, force or interference." *Cameron*, 598 F.3d at 68 (quoting *Lennon*, 66 F.3d at 424).

Here, Plaintiff's own testimony demonstrates that her disruptive conduct at the County Clerk's Office prevented the clerks from serving members of the public. (*See* Pl. State Dep., Dkt. 180-1 at 87:13–90:12 (Plaintiff testifying that she recorded video inside the County Clerk's Office even after she was informed that filming was not permitted, and that her conduct caused several clerks to stop serving the public despite many individuals waiting).)[14] Moreover, Defendants present evidence demonstrating that the disruption Plaintiff caused interfered with the State Defendants' and other court officers' official duty of preserving order in the Courthouse. (State 56.1 ¶¶ 2–3, 19–33.) Indeed, many courts have found probable cause to arrest for obstruction of governmental administration under New York law when plaintiffs refuse to comply with law enforcement officers' instructions. *See, e.g.*, *Linehan v. State*, 608 N.Y.S.2d 294, 294 (N.Y. App. Div. 1994) (affirming lower court's holding that court officer had probable cause to arrest plaintiff

---

[13] Because the Court finds that the State Defendants had probable cause to arrest Plaintiff for obstructing governmental administration, the Court does not address whether the State Defendants also had probable cause to arrest Plaintiff for resisting arrest or disorderly conduct.

[14] Plaintiff asserts without evidence that she is a member of the press. (Pl. State Dep., Dkt. 180-1 at 98:8–9.) Even if Plaintiff is a member of the press, she is not exempt from the state regulation that prohibits individuals from recording inside New York state courthouses. *See* N.Y. Comp. Codes R. & Regs. tit. 22 § 29.1.

who ignored another court officer's order); *Decker v. Campus*, 981 F. Supp. 851, 858 (S.D.N.Y. 1997) (finding probable cause to arrest plaintiff who "failed to comply with a deputy sheriff's instructions to 'step back' from the scene of an accident"); *Meyers v. City of New York*, No. 14-CV-9142 (ALC), 2019 WL 1397186, at *9 (S.D.N.Y. Mar. 28, 2019) (finding sufficient probable cause to arrest plaintiffs who disobeyed a dispersal order), *aff'd*, 812 F. App'x 11 (2d Cir. 2020) (summary order).  The same reasoning applies here; the State Defendants had probable cause to arrest Plaintiff for obstruction of governmental administration, and thus, her false arrest claim cannot survive.  The Court, therefore, grants summary judgment to the State Defendants on Plaintiff's false arrest claim.

b.    <u>Excessive Force</u>

The Court next considers Plaintiff's excessive force claim against the State Defendants. Broadly construing her allegations, the Court considers whether Plaintiff has raised a genuine question of material fact as to whether the State Defendants used excessive force against her (1) in wrestling her to the ground as she attempted to flee the County Clerk's Office on October 9, 2018, and (2) by using excessively tight handcuffs during the October 9, 2018 arrest.

(1)    Wrestling Plaintiff to the Ground

Plaintiff's excessive force claim against the State Defendants for their apprehension of her on October 9, 2018, fails because she has not produced any evidence from which a jury could conclude that the State Defendants employed excessive force during the arrest.  Indeed, the record shows that any force employed by the State Defendants was necessary to arrest Plaintiff, who admits she was attempting to flee.  Specifically, Plaintiff testified that though she "knew handcuffs were coming" because the State Defendants "said 'if you don't give us these phones we're going to arrest you,'" she responded by saying "I'm not giving you my phones and I'm leaving," (Pl.

25

State Dep., Dkt. 180-1 at 116:8–24), and by "tr[ying] to pull away" and "get away from them," including by flailing her arms while the State Defendants and other court officers tried to handcuff her, (*id.* at 117:6–25). According to Plaintiff's account, the State Defendants and other court officers then wrestled her to the ground, where they ultimately succeeded in handcuffing her. (*See id.* at 108:4–11, 110:25–111:2, 115:10–13, 133:23–24.)

"It is well-settled that the right to make a lawful arrest carries with it the right to use reasonable force to effectuate that arrest." *Rizk v. City of New York*, 462 F. Supp. 3d 203, 222 (E.D.N.Y. 2020) (citation omitted) (cleaned up). In *Tracy*, the Second Circuit explained that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Tracy*, 623 F.3d at 96 (quoting *Graham*, 490 U.S. at 397). Notably, in that case, the Circuit held that "as a matter of law," it was reasonable for an officer to "div[e] on top of" a fleeing suspect to "pin[] him down so that he could not get back up and continue to flee." *Id.* at 97–98. That is roughly analogous to this situation, where, even according to Plaintiff's own account, the State Defendants wrestled Plaintiff to the ground as she attempted to flee so that they could handcuff her. Thus, this Court also finds that, as a matter of law, the State Defendants exercised reasonable force.

The State Defendants also argue that Plaintiff's *de minimis* injuries "serve as conclusive evidence that de minimis force was used." (State Defs. Br. Supp. Summ. J., Dkt. 184 at 18.) The Court agrees that Plaintiff's *de minimis* injuries are relevant in determining whether the force used was reasonable, but does not agree that the extent of Plaintiff's injuries (or lack thereof) is dispositive. *See Presti v. City of New York*, No. 21-CV-3811 (PKC) (SJB), 2024 WL 3360404, at *7 (E.D.N.Y. July 10, 2024) ("That [the plaintiff's] injuries were *de minimis* is also relevant, albeit not dispositive." (cleaned up)); *see also Schlaepfer v. City of New York*, No. 20-CV-3339

(KPF), 2022 WL 4484571, at *15 (S.D.N.Y. Sept. 27, 2022) (noting that "[t]he *de minimis* nature of [p]laintiff's injuries confirm that the force used was not excessive," even though "a plaintiff need not have sought medical attention to support an excessive force claim").  "To be sure, some district courts in this circuit have dismissed Fourth Amendment excessive force claims on the grounds that the plaintiff's injuries were de minimis." *Rizk*, 462 F. Supp. 3d at 223 (collecting cases).  Other courts, however, have rejected that view, as does this Court. *See id.*; *Presti*, 2024 WL 3360404, at *7; *see also Eckhaus v. City of New York*, No. 18-CV-6901 (ARR) (PK), 2023 WL 3179506, at *6 (E.D.N.Y. May 1, 2023) ("[I]t is far from clear that the success of an excessive force claim depends on severity of injury."), *appeal dismissed*, No. 23-846 (2d Cir. July 11, 2023).

Nonetheless, Plaintiff's lack of anything more than a *de minimis* injury, (Brooklyn Hosp. Recs., Dkt. 180-5 at ECF 10–23), supports the Court's conclusion that the State Defendants used reasonable force in apprehending Plaintiff.

### (2)    Excessively Tight Handcuffs

Although it is unclear whether Plaintiff intended to bring an excessive force claim against the State Defendants based on allegedly tight handcuffing on October 9, 2018, (*see* Am. Compl., Dkt. 7 at ECF 69 (alleging that an unidentified court officer "placed hand cuffs [sic] on [Plaintiff's] already injured wrist tightly and [she] was immediately in pain")), the Court broadly construes Plaintiff's claims and considers whether Plaintiff has raised a genuine question of material fact as to a claim for excessively tight handcuffing on October 9, 2018.  The Court finds that she has not.

As an initial matter, the State Defendants argue that the Court should grant summary judgment on this claim because "an individual defendant is not liable under § 1983 absent personal involvement," and Plaintiff has not identified who placed the handcuffs on her in this instance. (State Defs. Br. Supp. Summ. J., Dkt. 184 at 20 (citing *Morris v. Eversley*, 282 F. Supp. 2d 196,

202 (S.D.N.Y. 2003)).)  The State Defendants are correct that Plaintiff has not produced any evidence positively identifying either of them as the officer who handcuffed her, as opposed to one of the other court officers who participated in the October 9, 2018 arrest.  (*See* Pl. State Dep., Dkt. 180-1 at 111:8–10, 115:17–21 (Plaintiff testifying that there were "a lot of" court officers surrounding her and she "d[id] not know who[se] handcuffs did the cuffing").)  That said, to show "personal involvement" as required to state an excessive force claim under Section 1983, a plaintiff "need not . . . positively identify which officers used the alleged excessive force against [her] to defeat a motion for summary judgment."  *Dispenza v. City of New York*, No. 19-CV-5645 (DG) (CLP), 2023 WL 11845608, at *20 (E.D.N.Y. Mar. 7, 2023) (quoting *John v. City of New York*, 406 F. Supp. 3d 240, 245 (E.D.N.Y. 2017)).  "Instead, [a] plaintiff 'must submit some sort of evidence that [the defendant] was present at the scene of the alleged assault.'"  *Id.* (quoting *Rose v. Garritt*, No. 16-CV-3624 (KMK), 2020 WL 409751, at *7 (S.D.N.Y. Jan. 23, 2020)).  In this instance, the State Defendants, by their own admission, were on the scene at the time Plaintiff was placed in handcuffs.  (Shea Decl., Dkt. 181 ¶ 24; Roc Decl., Dkt. 182 ¶ 24.)  Thus, the State Defendants' argument that they cannot be liable due to a lack of proven personal involvement is unpersuasive.

Even so, any claim of excessive force based on handcuffing during the October 9, 2018 arrest fails.  As explained above, courts in the Second Circuit typically consider the following evidentiary factors as a part of that inquiry: "(1) [whether] the [arrestee's] handcuffs were unreasonably tight; (2) [whether] the defendants ignored the arrestee's pleas that the handcuffs were too tight; and (3) the degree of injury to the [arrestee's] wrists."  *Cugini*, 941 F.3d at 612–13. Though Plaintiff testified that her handcuffs were too tight, (Pl. State Dep., Dkt. 180-1 at 108:6–7), she has not produced any evidence suggesting that any of the court officers at the scene,

including the State Defendants, "ignored [her] pleas that the handcuffs were too tight." *Cugini*, 941 F.3d at 612–13.  And, when she did tell the court officers that her "back was hurting," they called EMS.[15]  (Pl. State Dep., Dkt. 180-1 at 128:16–18.)  When EMS arrived, she told them "not to touch [her]," and requested that EMS transport her to the hospital, which they did.  (*Id.* at 128:21–129:17.)  The medical records from that visit suggest that Plaintiff suffered no more than a *de minimis* injury as a result of the handcuffs.  (*See* Brooklyn Hosp. Recs., Dkt. 180-5 at ECF 10–23 (finding that Plaintiff did not have any fractures, dislocations, or other abnormalities beyond pain that reduced when she took Tylenol).)  Moreover, x-rays from Plaintiff's April 2019 medical visit did not show any abnormalities.  (State 56.1 ¶¶ 48, 50.)  Consequently, a reasonable jury could not conclude that Plaintiff suffered more than a *de minimis* injury due to the handcuffing on October 9, 2018.  This, combined with the fact that there is no evidence that Plaintiff indicated to any officer present that her handcuffs were too tight, leads the Court to conclude that, as a matter of law, the force used in handcuffing Plaintiff was reasonable.  Thus, the Court grants summary judgment to the State Defendants on any excessive force claim based on the October 9, 2018 arrest of Plaintiff.

---

[15] To be clear, the Court finds that a reasonable officer would not have understood Plaintiff's statement that her "back was hurting," without more, to indicate that her handcuffs were excessively tight.  *Cugini*, 941 F.3d at 613 (explaining that courts ask "whether an officer reasonably should have known during handcuffing that his use of force was excessive").

**CONCLUSION**

For the reasons discussed herein, the State Defendants' motion for summary judgment is granted in its entirety, and the City Defendants' motion for summary judgment is granted as to the false arrest and excessive force claims against Defendant Rocke.  The City Defendants' motion for summary judgment of the unlawful entry claim against Defendant Brockington is denied.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of an appeal.  *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 20, 2025
      Brooklyn, New York